**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

LUCRETIA PATTERSON PENTAKOTA,          :

     Plaintiff,                               :

vs.                                    :          CA 14-0190-C

CAROLYN W. COLVIN,                     :
Acting Commissioner of Social Security,

                                :

     Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 20 & 22 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of counsel at the February 20, 2015 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 20 & 22 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

Plaintiff alleges disability due to bipolar disorder, post traumatic stress disorder ("PTSD"), carpal tunnel syndrome, asthma, and chronic obstructive pulmonary disease ("COPD"). The Administrative Law Judge (ALJ) made the following relevant findings:

**1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.**

**2.      The claimant has not engaged in substantial gainful activity since June 20, 2011, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

**3.      The claimant has the following severe impairments: Carpal tunnel syndrome, left; Bipolar Disorder, Not Otherwise Specified (NOS); Anxiety; Post Traumatic Stress Disorder (PTSD); Substance abuse; Asthma; Chronic Obstructive Pulmonary Disease (COPD); and Obesity (20 CFR 404.1520(c) and 416.920(c)).**

In evaluating this case, the claimant's date last [i]nsured (DLI) is relevant. The DLI is the last day of the last calendar quarter in which the requirements for entitlement to a period of disability and disability insurance benefits are met. In the claimant's case, this date is September 30, 2007. If onset of disability cannot be established on or before the DLI, the claim for a period of disability and disability insurance benefits under Title II must be denied. If the claim is for Title II benefits only, then the period of adjudication ends with the DLI. With regard to Title II benefits, several exhibits contain evidence after the claimant's date last insured. Nonetheless, the Administrative Law Judge has carefully read and considered all evidence regardless of whether it is specifically cited in the decision.

.          .          .

**4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

.          .          .

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of

2

decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. This finding is supported by the Psychiatric Review Technique assessment completed on September 8, 2011, by Harold Veits, M.D., a medical consultant with Disability Determination Services. The claimant is able to care for her own physical needs including bathing herself, dressing herself, taking medicine and cooking. She has no driving restrictions, is able and does drive. She was able to raise two children. According to testimony, on a typical day she takes care of her plants, reads, and cleans house. She cooks, but sometimes burns food because she forgets about it. She goes grocery shopping once a month.

In social functioning, the claimant has moderate difficulties. The evaluation in Exhibit 14F supports this finding. The claimant testified that she goes to the grocery store when most people are working. In her adult function report, she indicated that socially, she sits and talks and she does not go places.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. According to testimony, the claimant has problems concentrating. Despite the claimant's allegations of mental limitations, the claimant's cumulative high school record indicates she made A's, B's, C's, and some D's. Despite the claimant's mental limitations, she testified she likes to read science fiction and caring for her plants.

As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation, each of extended duration, according to the evaluation in Exhibit 14F.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitations and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria according to the evaluation in Exhibit 14F.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at step 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in

3

paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, sit, stand and walk for 6 hours in a work day, frequently use foot controls bilaterally, only frequently handle, feel and finger with her non-dominant hand, could frequently climb ramps and stairs but never ladders and scaffolds, frequently balance and stoop but only occasionally kneel, crouch and crawl, could never be exposed to unprotected heights or dangerous machinery, dangerous tools or hazardous processes and could occasionally operate a motor vehicle, be exposed to humidity and wetness and atmospheric conditions; she could only remember short simple oral or written instructions and would be unable to deal with detailed or multi-step instructions and she could perform simple routine repetitive tasks but would be unable to perform detailed or complex tasks, she could have no more than occasional contact with the general public, but could have frequent contact with co-workers and supervisors and would be able to accept constructive, non-confrontational criticism, work in small group settings and be able to accept changes in the work place setting if introduced gradually and would be unable to perform assembly line work with production rate pace.**

.     .     .

The claimant was 41 years of age on her alleged onset date. According to testimony, she completed nine months of college. The claimant's 2009 consultative examination provided the following information about her. She is able to care for her own physical needs including bathing herself, dressing herself, taking medicine, driving, and cooking. She is able to drive. She stated [] that she was able to raise her two children. However, since the onset of more significant psychiatric problems[,] her 15-year-old child now lives with her aunt. With regard to educational functioning, she reportedly performed well in school and graduated. She received an Associate's degree in the medical support staff field, but she has never worked in that field. She has worked primarily for herself or her mother as a seamstress. She last worked as a custom seamstress 1½ year[s] prior to February 2009. With regard to substance abuse history, she smokes one pack of cigarettes per day. She denied current problems with alcohol although she has a reported and significant history of illicit drug use. The last time she used illicit drugs was four to five years prior to 2009. She has a history of methamphetamine use.

.     .     .

4

According to information provided to the Social Security Administration on July 22, 2011, the claimant has trouble remembering key dates (hospitalizations, doctor's visits, etc.). It was also noted that the claimant seemed very anxious and distracted at times during the interview. At times, the interviewer noted that the claimant mumbled and made comments to herself and laughed. Several times, the interviewer asked the claimant to repeat the comments, and she responded "never mind." The claimant told the interviewer that she sees things that are not there; however, she denied hearing voices. The claimant alleged worsening of her conditions going back to May 2007, and that she has had additional medical problems and hospitalizations during and after May 2007.

On August 3, 2011, the claimant provided the following information in an adult function report: . . . She has no problems taking care of her personal needs. She cooks complete meals and does laundry. To travel, she walks and drives a car. She is able to count change, but is unable to pay bills, handle a savings account, and checkbook/money orders. Her hobbies included watching television and reading. Socially, she sits and talks. She does not go places. She has problems . . . completing tasks, concentrating, understanding, following instructions, using hands, and problems with memory. . . . She is "all right" with understanding written instructions. Her comprehension on verbal instructions depends on how long they are and she forgets them after 30 minutes.

.     .     .

On September 9, 2011, the claimant was denied disability benefits. Subsequently, on September 24, 2011, the claimant completed a Disability Appeal Report and indicated that since February 2011 her mental illness had progressed and her medication[s] were not working as well as they did in the past.

*The claimant alleges disability because of various mental conditions including problems with anxiety, insomnia, manic depression, bipolar disorder, having hallucinations, and being hospitalized for mental problems.* According to testimony, she has problems concentrating. She was placed on medications that make her sleepy. She testified that her medications make her feel like a zombie and make her sleep. She testified that she sees a counselor once a month and a psychiatrist every three months. She stated that she was hospitalized in North Harbor, and she was not functioning well. *She testified that she feels good when her psychiatric medications are right.*

With regard to the claimant's mental health treatment, [i]n December 2008, the claimant was admitted to the Emergency Department of W.O. Moss Regional Medical Center. She had taken a hand[]ful[] of pills and wanted to kill herself. She had been drinking. The claimant had a history of bipolar disorder and was admitted because of suicidal ideations. She had been drinking 750 ml (a fifth) of alcohol daily for the past 30 days. She

denied heavy drinking in the past and stated that she had been drinking because of being raped by three men three months prior. She was trying to forget the rape. She had nightmares, flashbacks, mood swings, decreased need for sleep, flight of ideas, and distractibility. She was recommended for continued hospitalization for stabilization or observation, psychopharmacology, and therapy. She was diagnosed with Alcohol Abuse, Post Traumatic Stress Disorder, and Bipolar Disorder, most recent episode mixed. The claimant reported that her medications from May 2008 were stolen, but she got them back in July 2008, and was running out of them again. Upon admission, the claimant had a global assessment functioning (GAF) score of 50. According to the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (DSM-IV),* a score of 41 to 50 represents serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Notably, the Commissioner has specifically declined to endorse the GAF scale for use in the disability programs, and has stated that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." While the GAF scores may be indicative of the claimant's alleged level of functioning on the date of treatment, the scores are assigned little weight when considering the cumulative evidence of record regarding the claimant's overall mental health condition. Furthermore, the undersigned has considered the cumulative evidence of record, including the claimant's credibility, in determining the residual functional capacity assessment. The appropriate limitations derived from claimant's impairments are reflected in the claimant's residual functional capacity and in the hypothetical question presented to the vocational expert at the administrative hearing.

*It is important to note that on December 22, 2008, upon discharge from W.O. Moss Regional Medical Center, the claimant's GAF score improved to 70.* According to the DSM-IV, a score of 70 represents some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social[,] occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Thus, with proper mental health treatment and medication therapy, the claimant's mental health improves.*

During her medical consultative examination on March 7, 2009, with Amanda Steen, M.D., the claimant was alert, oriented, with a pleasant mood, and appropriate range of affect. The medical examiner diagnosed bipolar disorder and asthma with chronic daily symptoms with mild hypoxia at rest. *Notably, the examiner was not an acceptable medical source to diagnose mental impairments. However, an examiner may offer his/her observations regarding the claimant's demeanor and overall presentation.*

In 2009 and 2010, the claimant received mental health treatment at West Alabama Mental Health Center. During a mental health visit in July 2010, the claimant's provider noted that she was pleasant and cooperative, and

planned to remain compliant with treatment and medication. The therapist further noted that the claimant was clean and sober. In June 2011, the claimant had diagnoses of Bipolar Disorder, NOS, alcohol abuse, and a history of Methamphetamine abuse. She had a GAF score of 50. As the claimant's admission at North Harbor shows, when she drinks she cannot control herself. She claimed that she did not drink alcohol while on medication. However, this statement is doubtful.

The medical record establishes that on June 18, 2011, the claimant was admitted [to the] DCH Health System. She had homicidal complaints, alcohol consumption, and was again off her medications. She had a history of anxiety, depression, psychosis, suicide attempt, suicide[al] ideation, substance abuse, alcohol intoxication, schizophrenia, and bipolar/mania. She was crying and laughing. She denied suicidal thoughts. She was treated with medication and discharged. . . . During the claimant's inpatient visit in June 2011, she had been non-compliant with her medications for two months. She had been drinking and her alcohol level was 402 (c). The claimant reported that she quit her job as a Cashier because she could no[] longer get free medications. She reported to the Social Security Administration that her last day at work was June 17, 2011, the date prior to her admission to the hospital.

*The claimant's mental health improved in August 2011. During a mental health session in August 2011, at West Alabama Mental Health Center, the claimant reported she was doing well, and she reported a reduction in depression. She stated that she was doing extra things around her home. She denied suicidal and homicidal thoughts. She reported good socialization skills. She reported a fair appetite and sleeping patterns. The therapist indicated the claimant was doing moderately well, planned to remain compliant in all areas and to follow-up in one month with the therapist.*

In March 2012, the claimant was hospitalized four days for mental health treatment at DCH Health System. She was seen in the Emergency Room. She was brought in by her family for increasingly erratic behavior, anger, and aggressive outbursts, and she requested adjustment of medications. After proper evaluation, she transferred to North Harbor. After treatment, the claimant show[ed] gradual improvement at the time of discharge. She was eating fairly well, and her sleep patterns and disease process resolved to a significant degree. She was placed on Trazadone. On March 5, 2012, the psychiatrist noted that she seemed to be doing better. In March 2012, a computer aided tomography (CT scan) of the claimant's head showed no significant abnormalities.

In March 2012, claimant's primary doctor indicated she was well-appearing, well-nourished, and in no distress. She was oriented X 3, with a normal mood except she was sitting in a wheelchair, and shaking all over. More than likely, the claimant was having an adverse reaction to drugs. She was treated for four days and released. She was able to sleep.

No other physical issues were noted throughout the hospital. She denied having hallucinations.

In March 2012, the claimant presented for a follow-up visit related to ambulation because she reported having had three falls. She also reported memory loss over the past two to three months. The claimant indicated that she was on new medications from West Alabama Mental Health Center. The claimant's doctor indicated she was well-appearing, well-nourished and in no distress. She was oriented X 3, with a normal mood except she was sitting in a wheelchair and shaking all over. She had no prominent rash or lesions. Her lungs were clear to auscultation and percussion. . . . Moreover, during a visit in May 2012 at West Alabama, the claimant reported reading a good book and helping her mother most days during the past week. She reported good physical health and no current problems. In May of 2012, the claimant agreed that she needed medication. The therapist indicated she had a good friend and great family support. The claimant was positive that she would stay compliant with her treatment.

In July 2012, David Hodo, M.D., a psychiatrist, evaluated the claimant. Dr. Hodo opined that the claimant's activities were limited due to her illness. The doctor indicated the claimant does help and looks after her mother. . . . The claimant's mood was depressed but was seen to be *at times exaggerated.* Her affect was appropriate and her speech was normal. Her thoughts at times were logical. She was not suicidal or homicidal. She was not then currently having any hallucinations. Her sensorium was intact and her cognitive function was appropriate to age. Her abstractions were adequate. She had trouble concentrating. The doctor diagnosed Manic Depressive Illness, bipolar type. Dr. Hodo also completed a Mental Medical Source Statement in the claimant. He opined that the claimant has marked or extreme limitations in all functional areas. *Notably, Dr. Hodo himself expressed concerns that the claimant's mood was exaggerated. The overall medical record does not support this evaluation. Moreover, the claimant's previous behavior in March and May 2012 is inconsistent with Dr. Hodo's evaluation.*

On February 26, 2009, the claimant was referred, at the request of the Social Security Administration, to a mental consultative examination performed by G. Jon Haag, Psy.D., a clinical psychologist. The examiner diagnosed Post Traumatic Stress Disorder and Alcohol Dependence, Early Full Remission. The examiner noted that the claimant did not appear acutely manic but had a recent history of suicide attempt. The examiner indicated that the claimant's mood appeared stable. The examiner indicated that evidence from the claimant's mental status examination and clinical interview revealed that her memory was not impaired. Her concentration was noted to be unimpaired. The examiner opined that the claimant appeared to be able to understand and follow simple instructions. The examiner further opined that the claimant's prognosis for improvement was estimated to be guarded.

On September 8, 2011, DDS Medical Consultant Dr. Veits completed a Mental Residual Functional Capacity Assessment on the claimant. The consultant opined that the claimant had the following limitations: The claimant has the ability to understand and carry out many short simple instructions. She can attend and concentrate[] for two-hour periods. The claimant would benefit from work which does not require frequent interaction with the general public. Work-setting changes should be minimal, gradual, and full explained. He also opined that she might need help setting goals.

.     .     .

*In evaluating the totality of evidence in this case, the claimant's subjective allegations of record regarding her symptoms and limitations exceed the minimal objective findings of abnormality documented in the medical evidence.* The claimant's representative pointed out that in North Harbor in March 2012, the claimant had a GAF of 30. However, it should be noted that in March 2012, the claimant presented for a follow-up visit related to ambulation and that she had had three falls. She also reported memory loss over the past two to three months. The claimant indicated that she was on new medications from West Alabama. The claimant's doctor indicated she was well-appearing, well-nourished and in no distress. She was oriented X 3, with a normal mood except she was sitting in a wheelchair and shaking all over. She had no prominent rash or lesions. Her lungs were clear to auscultation and percussion. . . . Moreover, during a visit in May 2012 at West Alabama, the claimant reported reading a good book and helping her mother most days during the past week. She reported good physical health and no current problems. In May of 2012, the claimant agreed that she needed medication. The therapist indicated she had a good friend and great family support. The claimant was positive that she would stay compliant with her treatment.

Treating Psychiatrist Dr. Hodo's opinion is not supported by the medical evidence. *Notably, Dr. Hodo himself expressed concerns that the claimant's mood was exaggerated. The overall medical record does not support this evaluation. Moreover, the claimant's previous behavior in March and May 2012 is inconsistent with Dr. Hodo's evaluation. Moreover, the medical record establishes [that] with proper mental health treatment and medication therapy, the claimant's mental health improves.*

.     .     .

The claimant's activities of daily living during the period in which she alleges total disability are not suggestive of disabling incapacity. The claimant is able to care for her own physical needs including bathing herself, dressing herself, taking medicine, driving, and cooking. She has no driving restrictions. She is able to drive. She was able to raise two children. According to testimony, on a typical day she takes care of her

9

plants, reads, and cleans house. She cooks, but sometime[s] burn[s] food because she forgets about it. She goes grocery shopping once a month. Socially, she sits and talks, [but] she does not go places. Moreover, as recently as July 2012, the claimant reported that she helps look after her mother. Therefore, the claimant is a caregiver. The role of caregiver is tremendous, and can be overwhelming. The responsibilities and role of a caregiver includes shopping, cooking, cleaning, and running errands. In many ways, the caregiver is the extra hand in providing the daily needs of an individual, such as transportation, bathing, toileting, dressing and feeding. Caregivers also supervise and dispense medication. If required, they arrange for healthcare professional[s] to evaluate the informed person. On a more abstract level, caregivers listen, talk, and provid[e] emotional support whenever possible. Therefore, the claimant's role as caregiver demonstrates she performed functions inconsistent with disability.

Finally, no treating or examining medical source has provided sufficient evidence to support a recommendation that restricts the claimant's activities or reported limitations regarding the capacity for work-related tasks in a manner inconsistent with the assessment of residual functional capacity in this decision.

.     .     .

As for the opinion evidence, the undersigned Administrative Law Judge gives partial weight to the consultative examiners at Exhibits 4F and 5F, as their opinions are consistent with the claimant's activities of daily living and treatment record. If these opinions were more recent, they would be given more weight as they are consistent with current medical records. The undersigned Administrative Law Judge[] gives some weight to the DDS medical consultants contain[ed] [here]in, as they are generally consistent with the medical record. However, the undersigned Administrative Law Judge gives substantial weight to the opinion at Exhibit 11F, as it points out that with regard to Title II benefits, most of the claimant's treatment occurred after her date last insured.

The undersigned Administrative Law Judge gives little weight to the opinion of Treating Psychiatrist Dr. Hodo. He opined that the claimant has marked or extreme limitations in all functional areas. Notably, Dr. Hodo himself expressed concerns that the claimant's mood was exaggerated. The overall medical record does not support this evaluation with relevant evidence. Moreover, the claimant's previous behavior in March and May 2012 is inconsistent with Dr. Hodo's evaluation. Moreover, the claimant learned the drapery business and worked with her mother in this business for 13 years. In addition, the claimant testified she was a Cashier at a Gas Station/Convenience Store. She was responsible for the gas pump machine, credit card machine, identification checks, and the cash register could not be more than $2.00 in error. Thus, Dr. Hodo's

evaluation placing the claimant in marked and extreme categories does not match the medical record and the observations at the hearing.

**6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as a Drapery Sewer, light, semiskilled and Cashier, light, unskilled. Accordingly, the claimant is unable to perform past relevant work.

**7.     The claimant was born on February 11, 1970 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is not disabled, whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

.          .          .

If the claimant had the residual functional capacity to perform the full range of light work, a finding of not disabled would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as the following: Garment Folder, DOT 369.687-018, light, unskilled (13,000 jobs in Alabama and 500,000 jobs nationally); Garment Sorter, DOT 789.687-058, light, unskilled (10,000 jobs in Alabama and 200,000 jobs nationally); and Tagger, DOT 794.687-058, light, unskilled (4,000 jobs in Alabama and 300,000 jobs nationally).

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of not disabled is therefore appropriate under the framework of the above-cited rule.

**11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 20, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. 14-15, 15, 15-17, 17-18, 18, 19-22, 23-24, 24-25, 26 & 27 (internal citations and some quotation marks omitted; emphasis in original).)  The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and, thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005. Once the claimant meets this burden, as here, it becomes the Commissioner's burden to prove that the claimant is capable, given her age, education and work history, of engaging in another kind of substantial gainful employment, which exists in the national economy.  *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform those light jobs

identified by the vocational expert, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[2] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam)[3] (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, plaintiff raises the sole issue that the ALJ erred in finding she does not meet Listing 12.04. (Doc. 16, at 1; *see also id.* at 1-8.) In this circuit, Pentakota bears the burden of proving that she has an impairment which meets or is medically equivalent to a listed impairment. *Frame v. Commissioner, Social Security Administration,* 2015 WL 150733, *2 (11th Cir. Jan. 13, 2015) ("To prevail at step three, the claimant must provide specific evidence—such as medical signs, symptoms, or laboratory-test results—showing that her impairment meets or medically equals a listed impairment. *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990). 'For a claimant

---

[2] This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

[3] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'"); *see also Himes v. Commissioner of Social Security,* 585 Fed.Appx. 758, 762 (11th Cir. Sept. 26, 2014) ("To meet a Listing, the claimant must meet all of the specified medical criteria, and an impairment that fails to do so does not qualify no matter how severely it meets some of the criteria. The claimant bears the burden of proving [s]he meets a Listing. A claimant must have a diagnosis included in the Listings and provide medical reports showing that [her] conditions meet the specific criteria of the Listings and the duration requirement. However, an impairment cannot meet the criteria of a Listing based only on a diagnosis." (internal citations omitted)); *Barclay v. Commissioner of Social Security Administration,* 274 Fed.Appx. 738, 741 (11th Cir. Mar. 12, 2008) ("The claimant has the burden of proving an impairment meets or equals a listed impairment. To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports[4] documenting that the conditions meet the specific criteria of the Listings and the duration requirement." (quotation marks and citations omitted; footnote added)). Once an impairment is shown to meet or medically equal a listed impairment, a claimant is "conclusively presumed to be disabled based on . . . her medical condition." *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997).

To establish presumptive disability under Listing §12.04, the listing for affective disorders, a claimant "must meet the requirements in both paragraphs A and B, or meet the requirements in paragraph C." *Himes, supra,* 585 Fed.Appx. at 762 (citation omitted).

---

[4]     "Medical opinions are 'statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment[s].'" *Himes, supra,* 585 Fed.Appx. at 762, quoting 20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2).

Paragraph A requires medically documented persistence, either continuous or intermittent, of a qualifying depressive syndrome, manic syndrome, or bipolar syndrome. Paragraph B requires that the medically documented persistent syndrome result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. Marked means more than moderate but less than extreme, and occurs when the degree of limitation seriously interferes with a claimant's ability to function independently, appropriately, effectively, and on a sustained basis. Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. To have a repeated episode of extended duration, a claimant must have three episodes within one year, or an average of once every four months, each lasting at least two weeks.

Paragraph C requires a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, in addition to one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in such marginal adjustment that it is predicted that even a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of at least one years' inability to function outside a highly supportive living arrangement, and an indication that this arrangement needs to be continued.

*Id.* at 763 (internal citations, quotation marks, and brackets omitted).

In this case, plaintiff makes no attempt to establish that her impairments meet the requirements in paragraph C (*see* Doc. 16); therefore, the sole focus herein will be whether Pentakota has established that she meets the requirements in both paragraphs A and B. *See Himes, supra,* 585 Fed.Appx. at 762. As for paragraphs A and B, plaintiff specifically contends in her brief that "[s]he exhibits bipolar syndrome with marked restriction of activities of daily living, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace." (Doc. 16, at 7.) Because Pentakota makes no argument that the ALJ erred in finding she

has not experienced repeated episodes of decompensation, each of extended duration (*see id.*), and the record fails to demonstrate three episodes of decompensation during a single year (*see, e.g.,* Tr. 439 & 602 (June 2011 hospitalization for two or three days due to plaintiff being off her medications and alcohol abuse); Tr. 57 & 702-722 & 766 (March 2012 hospitalization for five days caused by one of her medications, specifically Risperdal)), the Court's task becomes one of determining whether the plaintiff has shown that she has "at least two of the following: (1) marked restriction of daily living; (2) marked difficulties in maintaining social functioning; [and] (3) marked difficulties in maintaining concentration, persistence, or pace[.]" *Lee v. Commissioner, Social Security Administration,* 551 Fed.Appx. 539, 542 (11th Cir. Jan. 8, 2014) (citation omitted).

This Court simply cannot agree with Pentakota's argument that "[t]he ALJ has failed to identify any substantial evidence to support his decision that [she] does not meet Listing 12.04." (Doc. 16, at 7.) Indeed, substantial evidence supports the ALJ's decision that Pentakota did not satisfy Paragraph B, which is the proper framing of the issue. *See Lee, supra.* The medical evidence does not reveal that Pentakota had marked limitations in activities of daily living, maintaining social functioning, or maintaining concentration, persistence or pace. For instance, although Dr. David W. Hodo noted during his one-time examination of plaintiff on July 17, 2012 that Pentakota "did have trouble concentrating[]" (Tr. 773), another one-time examiner indicated that her concentration was not impaired (Tr. 339-340) and the record contains other indications that her concentration was not impaired or otherwise was okay when on appropriate medication (*see, e.g.,* Tr. 334 & 336). Moreover, there are numerous indications in the medical record that plaintiff had a circle of friends and never exhibited any severe problems with social functioning. (*Compare, e.g.,* Tr. 338 ("Mrs. P[entakota] does not appear to have any impairments in social functioning. **This was evidence by display of**

***appropriate social skills.*** She reports [] that she has multiple friends an[d] has no problems initiating or sustaining friendships." (emphasis supplied)) *with* Tr. 474 (Pentakota reported good socialization skills), Tr. 475 (reference to Paul Smith, a friend), Tr. 722 & 784 (reference to a boyfriend); Tr. 484 & 773 (she goes to church as often as she can and attends the Baptist church); Tr. 779 (reference made to a "good friend").) Finally, the medical evidence indicates that plaintiff's grooming was appropriate (Tr. 293, 296, 299, 302, 334, 336; *see also, e.g.,* Tr. 353, 357, 407, 409 & 765 ("Well appearing, well nourished in no distress.")), she is able to independently care for her grooming and hygiene (Tr. 338; *see also* Tr. 346 ("She is clean, well-groomed, well-dressed . . . .")), and, as well, is able to engage in numerous other activities of daily living (Tr. 338 (she can drive and cook); Tr. 344 (she drives, shops, cooks, and performs household chores, including sweeping, mopping, vacuuming, washing dishing); Tr. 474 (Pentakota referenced doing extra things around her home); Tr. 773 ("She does some housework, and she cuts the grass sometimes."); Tr. 779 ("She relaxes with her dog."); Tr. 780 ("Enjoying reading a good book. Client helps her mother most days.") & Tr. 784 ("Planted a garden for her mother. She and her boyfriend will keep up the garden for her mother.").) This evidence is consistent with the Psychiatric Review Technique form completed by non-examiner, Dr. Harold Veits, on September 8, 2011 (Tr. 509-522 (reflecting mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation)), as well as the clear evidence of record that plaintiff's mental condition is manageable when she takes her medications and the proper medications have been supplied for her use (*compare* Tr. 51 (plaintiff's testimony that when her psychiatric medications are right and she is not using any alcohol or a controlled substance, her psychiatric condition significantly improves) *with,*

*e.g*, Tr. 439 & 602 (June 2011 hospitalization for two or three days due to plaintiff being off her medications and alcohol abuse); and Tr. 57 & 702-722 & 766 (March 2012 hospitalization for five days caused by one of her medications, specifically Risperdal)), and supplies substantial support for the ALJ's decision that Pentakota had mild restrictions in activities of daily living and moderate difficulties in social functioning and maintaining concentration, persistence or pace.[5]

To the extent Pentakota relies upon the Mental Medical Source Statement completed by one-time examiner Dr. David Hodo[6] on July 24, 2012 (Tr. 774-775) as contradictory of the ALJ's findings, such reliance need fail[7] inasmuch as the ALJ identified specific and adequate reasons for rejecting the findings of Dr. Hodo (*see, e.g.*, Tr. 26 (identification of reasons for rejecting Dr. Hodo's "marked or extreme limitations in all functional areas")), *cf. Gilabert v. Commissioner of Soc. Sec.*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) (per curiam) ("Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error."), and plaintiff did

---

[5]    However, even assuming, that the ALJ erred in finding plaintiff had only moderate limitations in maintaining concentration, persistence, or pace, as opposed to marked limitations, "any error was harmless" because Pentakota had to meet two of the four criteria in Paragraph B, and she makes no argument (or showing) that she had the requisite episodes of decompensation that were of extended duration. *See Himes, supra*, 585 Fed.Appx. at 764.

[6]    The ALJ twice mistakenly identifies Dr. Hodo as plaintiff's treating psychiatrist (*see* Tr. 24 & 26); he is not plaintiff's treating psychiatrist, as he saw her on only one occasion, on July 17, 2012 (Tr. 772-773), and then some seven days later completed a mental medical source statement (Tr. 774-775).

[7]    In addition, to the extent plaintiff seems to suggest that the ALJ was prohibited from relying upon evidence of record existing prior to her amended onset date of June 20, 2011 (Tr. 38), the undersigned cannot agree both because plaintiff has never "withdrawn" her claim for disability insurance benefits (*compare* Doc. 1, at 1 *with* Doc. 16, at 1), despite her date last insured of  September 30, 2007 (Tr. 14), and because plaintiff cites to medical evidence of record existing prior to June 20, 2011, in support of her claims for relief (*see* Doc. 16, at 1-2 & 3-4).

not identify in her brief as a specific assignment of error the ALJ's rejection of Dr. Hodo's functional limitations (*see* Doc. 16).

Because Pentakota has not shown that the ALJ erred at step three, the only error raised in her brief (*see* Doc. 16), and because substantial evidence supports the Commissioner's decision as a whole,[8] the decision denying benefits must be affirmed.

<u>CONCLUSION</u>

It is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 6th day of March, 2015.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

[8]      In other words, based upon the contents of the record as a whole (*see, e.g.*, Tr. 43, 51-56, 199-206, 293-308, 334-340, 343-347, 351-358, 381-395, 407-410, 439, 455-457, 472-522, 537-539, 551-563, 602-623, 638, 675-690, 702-711, 721-722, 762-767 & 777-793), the Court cannot agree with the statement of plaintiff's counsel during oral argument that the ALJ's RFC determination (*see* Tr. 16-17) was a product of "atmospheric extraction."